UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DWAYNE WILSON,

     Applicant,

v.                                   CASE NO. 8:14-cv-29-SDM-AAS

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **ORDER**

     Wilson applies under 28 U.S.C. § 2254 for the writ of habeas corpus (Doc. 1) and challenges his conviction for second-degree murder, for which Wilson is imprisoned for life.  Numerous exhibits ("Respondent's Exhibit ___") support the response.  (Doc. 10)  The respondent admits the application's timeliness (Doc. 19 at 3) but argues that some grounds are unexhausted and procedurally defaulted. (Doc. 19 at 6, 9, 14)

## **I.  BACKGROUND**[1]

     Wilson fathered a child with Felicia Watson.  But Michael Harris was Felicia's boyfriend when on March 16, 2004, Wilson and Felicia argued on the telephone.  Wilson wanted to pick up their child from Felicia's home.  Felicia wanted Wilson to pick up their child from day care.  Wilson yelled at Felicia and

_____

[1] This summary of the facts derives from the briefs on direct appeal. (Respondent's Exhibits 7 and 8)

told her that he was coming to her home.  When Wilson entered Felicia's home, he saw the child sitting on Harris's lap without shoes.  Wilson and Harris exchanged insults, and Wilson picked up the child to leave.  Harris and Wilson went outside to get the child's car seat from Felicia's car.

While outside, Wilson and Harris continued to argue.  Wilson stabbed Harris in the neck with a fishing knife that Wilson kept in his pocket.  Almost severing Harris's spinal cord, Wilson killed him.  Felicia came outside and saw Harris lying on the ground and saw the child standing over him.  Angry, Felicia went inside the house, grabbed a small knife from the kitchen, went back outside the house, and threw the knife at Wilson, who left in his car.

Felicia called 911 and identified Wilson as the person who stabbed Harris.  Police did not find a weapon on Harris but found the knife from Felicia's kitchen in the street.  A blood test showed that Harris had consumed cocaine earlier that day, but a medical examiner opined that Harris would not have been intoxicated at the time of the killing.  Just after the crime, a homicide detective called Wilson ten times, left a voicemail, and sent a sheriff's deputy to Wilson's home.  Wilson surrendered to police fifteen days later.

At trial, the prosecutor called as a witness a court reporter, who read testimony by Wilson from his first trial.[2]  Wilson testified that, when he and Harris went outside, Harris pointed his finger at Wilson's face and threatened to "f*ck

---

[2] A jury found Wilson guilty of second-degree murder, and the state appellate court reversed the conviction because the jury instruction on self-defense was erroneous. *Wilson v. State*, 944 So. 2d 1244 (Fla. 2d DCA 2006).

[Wilson] up."  Wilson and Harris continued to argue.  Wilson testified that he thought that the "look" on Harris's face suggested aggression and thought he saw a knife-like object in Harris's hand.  When Harris approached him, Wilson grabbed the knife from his pocket and stabbed Harris.  Wilson testified that he thought his life was in danger and feared that Harris would hurt the child.  Wilson left after telling Felicia to call the police.

## II.  EXHAUSTION AND PROCEDURAL DEFAULT

The respondent argues that grounds two, three, and five are procedurally barred from federal review because Wilson failed to exhaust his available state court remedies.  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (citing *Duncan*, 513 U.S. at 365–66).

## Ground Two:

Wilson asserts that the state court violated his right to due process and a fair trial under the Sixth and Fourteenth Amendments because the evidence at trial failed to prove he acted with ill will, hatred, spite, or evil intent.  (Doc. 1 at 5)

Wilson presented a similar claim as his second issue on direct appeal and cited *Michelson v. State*, 805 So. 2d 983 (Fla. 4th DCA 2001).  (Respondent's Exhibit 7 at 12–16)  Because *Michelson* both cited *United States v. Gaudin*, 515 U.S. 506 (1995), and decided a similar claim on federal constitutional law, Wilson alerted the state court to the federal nature of his claim.  *Michelson*, 805 So. 2d at 985 ("The United States Constitution requires that criminal convictions must rest upon a determination that the defendant is guilty beyond a reasonable doubt of every element of the crime with which he has been charged."); *Reese*, 541 U.S. at 32 ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'").  Ground two is entitled to a review on the merits.

**<u>Ground Three:</u>**

Wilson asserts that the state court violated his right to due process and a fair trial because no evidence at trial disproved his claim of self-defense.  (Doc. 1 at 7–8)  Wilson presented a similar claim as his third issue on direct appeal but presented that issue under state law — not as the violation of a federally protected right.  (Respondent's Exhibit 7 at 17–19)  The failure to alert the state appellate court that the trial court violated a federally protected right fails to meet the exhaustion requirement.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that

a somewhat similar state-law claim was made.") (citations omitted); *Preston v. Sec'y, Fla. Dep't Corrs.*, 785 F.3d 449, 459 (11th Cir. 2015) ("Preston asserted in his brief that his conviction rested on insufficient evidence, without clarifying whether he intended to bring a federal or a state sufficiency of the evidence claim . . . .  Preston invoked a phrase common to both federal and state law without explaining which body of law provided the basis for his claim.").  Ground three is unexhausted.

**Ground Five:**

Wilson asserts that trial counsel was ineffective for misstating the evidence during closing argument by telling the jury that Wilson testified at trial.  (Doc. 1 at 14–15)  Wilson presented the claim as his second ground in his Rule 3.850 motion for post-conviction relief (Respondent's Exhibit 11 at 10–11) but did not present the claim in his brief on appeal.  (Respondent's Exhibit 15)  Wilson's failure to present to the state appellate court the ineffective assistance of counsel claim deprived the state court of a "full and fair opportunity to resolve any constitutional issues."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Ground five is unexhausted.

\* \* \* \*

Wilson could have raised the claim in ground three on direct appeal and is barred from doing so collaterally in a Rule 3.850 motion.  Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence.").  Wilson could have raised the claim in ground five on appeal of the denial of his first Rule 3.850 motion, and the claim is barred in a successive Rule

3.850 motion. Fla. R. Crim. P. 3.850(h)(2). Because Wilson cannot raise the claims in ground three and ground five in state court, the grounds are procedurally defaulted in federal court. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief.").

Ground three and ground five are barred from federal review absent a showing of "actual cause and prejudice" or a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Wilson proffers no specific facts to establish either "cause and prejudice" or a "fundamental miscarriage of justice." (Doc. 22 at 17–20) Consequently, ground three and ground five are procedurally barred from federal review.

## III. **STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 governs this proceeding. *Wilcox v. Fla. Dep't Corrs.*, 158 F.3d 1209, 1210 (11th Cir. 1998). Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

> established Federal law, as determined by the Supreme Court of the United States; or
>
> resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. . . . Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 694. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim issues an explanatory and reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. A respondent may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court affirmed Wilson's conviction and sentence. (Respondent's Exhibit 9) Similarly, in another *per curiam* decision without a written opinion the state appellate court

affirmed the denial of Wilson's Rule 3.850 motion for post-conviction relief. (Respondent's Exhibit 18)  A state appellate court's *per curiam* decision without a written opinion warrants deference under Section 2254(d)(1).  *Wright v. Sec'y Dep't Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002).  *Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

"[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Wilson bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The presumption applies to a finding of fact but not to a mixed determination of law and fact.  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).  Wilson's federal application presents the same grounds that he presented to the state court.  The state court's rejection of Wilson's claims warrants deference in this federal action. (Respondent's Exhibit 9, Exhibit 12 at 4, and Exhibit 14 at 2–6)

# IV.  ISSUES ON DIRECT APPEAL

## Ground One:

Wilson asserts that the state court violated his rights to due process and a fair trial under the Sixth and Fourteenth Amendments because the trial court admitted into evidence at trial Wilson's testimony from his first trial.  (Doc. 1 at 4–5)

The state appellate court affirmed the denial of this claim on direct appeal in a decision without a written opinion.  (Respondent's Exhibit 9)  Wilson has the burden to show no reasonable basis for the denial of relief.  *Richter*, 562 U.S. at 98.

"If the prosecution has actually violated the defendant's Fifth Amendment rights by introducing an inadmissible confession at trial, compelling the defendant to testify in rebuttal, the rule announced in *Harrison v. United States*, 392 U.S. 219 (1968), precludes use of that testimony on retrial."  *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).  However, as *Harrison* explains, 392 U.S. at 222–23, if no inadmissible confession compelled the defendant to testify at the first trial, the prosecution may introduce the testimony on retrial:

> In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.
>
> Here, however, the petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby — the fruit of the

> poisonous tree, to invoke a time-worn metaphor. For the 'essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.' *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).
>
> In concluding that the petitioner's prior testimony could be used against him without regard to the confessions that had been introduced in evidence before he testified, the Court of Appeals relied on the fact that the petitioner had 'made a conscious tactical decision to seek acquittal by taking the stand after (his) in-custody statements had been let in . . . .' But that observation is beside the point. The question is not whether the petitioner made a knowing decision to testify, but why. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible. . . .

The state appellate court reversed Wilson's conviction after his first trial because the jury instruction for self-defense was erroneous. *Wilson v. State*, 944 So. 2d 1244 (Fla. 2d DCA 2006). At his first trial the prosecutor introduced no unlawful confession, and no unlawful confession compelled Wilson to testify. "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [the United States Supreme Court's] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014). Consequently, the state court did not unreasonably apply *Harrison*. *Harrison*, 392 U.S. at 223 n.9 ("[W]e decide here only a case in which the prosecution illegally introduced the defendant's confession in evidence against him at trial in its case-in-chief.").

In his reply Wilson expands his claim and asserts that he testified at his first trial because trial counsel misadvised and coerced him to testify. (Doc. 22 at 3, 6–7)

He further asserts that trial counsel was ineffective for not moving to exclude his testimony from his first trial before his retrial. (Doc. 22 at 11)[3] Wilson supports the expanded claim with testimony from the evidentiary hearing on his Rule 3.850 motion for post-conviction relief. (Doc. 22 at 4–5, 7–10, 12–13)

Because Wilson expands the claim for the first time on reply, the expanded claim is waived. *Herring v. Sec'y, Dep't Corrs.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'") (citation omitted). Also, the state appellate court rejected the claim in ground one on direct appeal. (Respondent's Exhibit 9) Because the transcript from the post-conviction evidentiary hearing was not part of the record on direct appeal, the district court cannot consider the transcript on federal habeas. *Pinholster*, 563 U.S. at 181–82. Consequently, ground one is denied.

**Ground Two:**

Wilson asserts that the state court violated his rights to due process and a fair trial under the Sixth and Fourteenth Amendments because the evidence at trial lacked proof that he acted with ill will, hatred, spite, or evil intent. (Doc. 1 at 5)

---

[3] In ground seven Wilson asserts that trial counsel was ineffective for coercing and intimidating him to testify at his first trial. (Doc. 1 at 16–17) The record refutes the claim. (Respondent's Exhibit 13 at 51–52 and Exhibit 14, Transcript (May 25, 2005) at 402–03) At the retrial, counsel objected to the admission of Wilson's testimony from his first trial. (Respondent's Exhibit 4 at 362) On direct appeal appellate counsel challenged the admission of the testimony (Respondent's Exhibit 7 at 8–11), and the State raised no challenge to preservation. (Respondent's Exhibit 8 at 7)

The state appellate court affirmed the denial of this claim on direct appeal in a decision without an opinion. (Respondent's Exhibit 9)[4] Wilson has the burden to show no reasonable basis for the denial of relief. *Richter*, 562 U.S. at 98.

A defendant is entitled to relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The court views the evidence at trial in the light most favorable to the prosecution. 443 U.S. at 319.

A jury found Wilson guilty of second-degree murder. The prosecution had to prove that Wilson unlawfully killed Harris "by any act imminently dangerous to another" and "evincing a depraved mind regardless of human life." Fla. Stat. § 782.04(2). "In the context of second-degree murder, an act is imminently dangerous to another and evinces a 'depraved mind' if it is an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another; and (2) is done from ill will, hatred, spite or an evil intent; and (3) is of such a nature that the act itself indicates an indifference to human life." *Thompson v. State*, 257 So. 3d 573, 579 (Fla. 1st DCA 2018) (citation and quotation marks omitted). Neither a reckless act nor an immediate and impulsive overreaction to an assault is enough. 257 So. 3d at 579–80.

---

[4] At the close of evidence trial counsel moved for judgment of acquittal on other grounds. (Respondent's Exhibit 4 at 459–88) On direct appeal Wilson asserted a failure to prove intent (Respondent's Exhibit 7 at 12–16), and the State raised no challenge to preservation. (Respondent's Exhibit 8 at 8–11)

At trial Felicia testified that, on the day of the crime, she and Wilson argued on the telephone.  (Respondent's Exhibit 4 at 175–76)  Wilson wanted to pick up their son from Felicia's home; Felicia wanted Wilson to pick up their son from day care.  (Respondent's Exhibit 4 at 173–74)  When Wilson told Felicia, "I'm coming to get my son," Felicia hung up the telephone.  (Respondent's Exhibit 4 at 176–77)  During five more telephone calls, Wilson and Felicia continued to argue.  (Respondent's Exhibit 4 at 177)  During the final call, Wilson became "angrier and angrier" and started to yell at Felicia.  (Respondent's Exhibit 4 at 177)  Felicia stopped answering Wilson's calls.  (Respondent's Exhibit 4 at 178–80)

Later that morning, Wilson went to Felicia's home.  (Respondent's Exhibit 4 at 182)  When Wilson walked into the home, Harris was playing with Wilson's son and helping the child put on shoes while the child sat in Harris's lap.  (Respondent's Exhibit 4 at 181–82)  Wilson asked Harris, "[W]hat's up[,] Pimpie?"  (Respondent's Exhibit 4 at 185)  Harris responded, "[N]othing, what's up[?]"  (Respondent's Exhibit 4 at 186)  Wilson replied in a raised voice, "[F]irst of all you can put my mother f*cking son down."  (Respondent's Exhibit 4 at 186–87)  Harris put the child down and said, "[H]ere you go.  It [doesn't] even have to be like that."  (Respondent's Exhibit 4 at 187)

Wilson angrily told Felicia, "[A]s for you, b*tch, you can go out there and get the mother f*cking car seat."  (Respondent's Exhibit 4 at 187–88)  Felicia responded, "[F]irst of all, you can get out of my house."  (Respondent's Exhibit 4 at 188)  Wilson replied louder, "[B]*tch, you're [going to] go get the mother f*cking

car seat." (Respondent's Exhibit 4 at 188) Felicia again told Wilson, "You can get out of my house." (Respondent's Exhibit 4 at 189) While Wilson and Felicia continued to argue, Harris interjected and told Wilson, "[F]irst of all, you're not going to come in here with this. You wanted your son. You got your son. But you're not fixing to come in here with all that cursing." (Respondent's Exhibit 4 at 189–90) Wilson replied, "You can stay out of it." (Respondent's Exhibit 4 at 191)

Felicia threatened to call the police, and everyone calmed down. (Respondent's Exhibit 4 at 191–92) Harris told Felicia to get ready for work and walked outside to get the car seat from Felicia's car. (Respondent's Exhibit 4 at 192–95) Wilson walked behind Harris while holding his son in his arm. (Respondent's Exhibit 4 at 194) After a few minutes, a friend who lived with Felicia told her to get her son because Wilson and Harris were about to fight. (Respondent's Exhibit 4 at 195–96) Felicia found Harris lying on the ground and her child standing over him. (Respondent's Exhibit 4 at 200) Wilson walked away with his hand in his pocket. (Respondent's Exhibit 4 at 202)

Felicia angrily asked Wilson, "[W]hat did you do to him?" (Respondent's Exhibit 4 at 203) Wilson walked towards his car, looked at Felicia, and called her a "b*tch." (Respondent's Exhibit 4 at 203–04) Felicia went inside her home, grabbed a knife from a butcher block, ran back outside, and threw the knife at Wilson. (Respondent's Exhibit 4 at 205) Wilson drove away in his car.

(Respondent's Exhibit 4 at 205)  Felicia did not see a weapon either in Harris's hand or on the ground near his body.  (Respondent's Exhibit 4 at 203, 206–07)

The friend who lived with Felicia testified that she saw Wilson and Harris standing outside next to Felicia's car.  (Respondent's Exhibit 4 at 244)  Wilson held his son in his arm and was yelling at Harris.  (Respondent's Exhibit 4 at 245–46)  Harris tried to calm Wilson down.  (Respondent's Exhibit 4 at 245–46)  The friend did not see anything in Wilson's hand.  (Respondent's Exhibit 4 at 246)

A homicide detective testified that he tried to locate Wilson after the crime.  (Respondent's Exhibit 4 at 337–39, 343–45)  The detective called Wilson's mobile telephone ten to fifteen times and left a voicemail.  (Respondent's Exhibit 4 at 338)  The detective asked other deputies to go to the home where Wilson lived.  (Respondent's Exhibit 4 at 339–40)  The detective issued a "be on the lookout" report and obtained a warrant for Wilson's arrest.  (Respondent's Exhibit 4 at 341, 343)  Wilson surrendered to authorities fifteen days after the crime.  (Respondent's Exhibit 4 at 345)  The detective never recovered a weapon from Wilson.  (Respondent's Exhibit 4 at 345)

Wilson's girlfriend testified that Wilson told her what happened just after the killing.  According to the girlfriend, Wilson said that Harris approached him with a knife, that Wilson grabbed Harris's wrists and pushed him down, and that Harris fell onto the knife.  (Respondent's Exhibit 4 at 352–54)  Wilson pushed Harris to defend both himself and his son.  (Respondent's Exhibit 4 at 361)

At his first trial, Wilson testified that he arrived at Felicia's home to pick up his son. (Respondent's Exhibit 4 at 368) Wilson had a fishing knife in the back seat of his car and put the knife in his pocket so that his son would not hurt himself. (Respondent's Exhibit 4 at 368) Wilson went inside the home to get his son; Harris picked up the child and said that the child was "alright." (Respondent's Exhibit 4 at 370) Wilson told Harris not to touch his son, and the two men started to argue. (Respondent's Exhibit 4 at 370–72) Also, Wilson argued with Felicia and insulted her because the child was not ready to leave. (Respondent's Exhibit 4 at 370–72)

Harris agreed to get the child's car seat. (Respondent's Exhibit 4 at 372) Wilson walked outside with the child. (Respondent's Exhibit 4 at 373) Harris followed, closed the front door, and quickly turned in front of Wilson. (Respondent's Exhibit 4 at 373) Harris told Wilson, "I'm telling you, man, I'll f*ck you up, man." (Respondent's Exhibit 4 at 373) Wilson replied, "[M]an, get your hand out of my mother f*cking face. Don't f*ck with me, man." (Respondent's Exhibit 4 at 373) Wilson stabbed Harris with the fishing knife because he thought Harris was going to stab him with an object that Wilson thought was a knife. (Respondent's Exhibit 4 at 373–74, 377–78, 401) Wilson feared for both his own life and his son's life. (Respondent's Exhibit 4 at 376, 378, 414–15)

The evidence proved that Wilson had ill will, hatred, spite, and evil intent when he stabbed Harris. Wilson argued with Felicia on the telephone about their son, yelled at Felicia, and went to Felicia's home uninvited. When Wilson arrived at Felicia's home, he continued to argue with Felicia, directed his anger at Harris

when he saw Harris playing with his son, and insulted both Felicia and Harris.  Just before the stabbing, Wilson continued to argue with Harris and spoke to him with an angry tone.  Wilson stabbed Harris in the neck, almost severed his spinal cord, and mortally wounded him.  After the stabbing, Wilson rendered no aid, called Felicia a "b*tch," left in his car, and surrendered to police fifteen days later.

Viewing the evidence in the light most favorable to the prosecution, Wilson stabbed Harris with ill will, hatred, spite, and evil intent.  *Peoples v. State*, 251 So. 3d 291, 303 (Fla. 1st DCA 2018) ("[T]he circumstances surrounding the fatal act can prove ill will, spite, hatred or evil intent.  Here, in addition to Appellant's use of a deadly weapon to stab the victim — an act which itself could be sufficient to infer the requisite intent — the evidence here showed that Appellant was familiar with the victim before the stabbing and thought he 'looked like a punk.'") (citations omitted).  *Twilegar v. State*, 42 So. 3d 177, 196 (Fla. 2010) ("[E]vidence of flight, concealment, or resistance to lawful arrest after the fact of a crime is admissible as 'being relevant to consciousness of guilt which may be inferred from such circumstances.'") (citation omitted).

Certain evidence, if believed, arguably proved that Wilson acted in self-defense.  However, the court must view the evidence in the present context in the light most favorable to the prosecution.  *Jackson*, 443 U.S. at 319.  The court looks "both to direct and circumstantial evidence in resolving the question of the sufficiency of the evidence underlying the conviction."  *Pate v. Wainwright*, 607 F.2d 669, 670 (5th Cir. 1979).  "[C]onflicting evidence alone does not undermine that

conclusion of sufficiency so long as a rational factfinder could have credited one side of the conflicting testimony over the other." *Wilcox v. Ford*, 813 F.2d 1140, 1145 (11th Cir. 1987).  Consequently, the state court did not unreasonably apply *Jackson*.  Ground two is denied.

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

Wilson claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*,
>
> > First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient

showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Wilson must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To meet this burden, Wilson must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

Wilson cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In denying Wilson's Rule 3.850 motion for post-conviction relief, the state court recognized that *Strickland* governs a claim of ineffective assistance of counsel. (Respondent's Exhibits 12 and 14)  Because the state court rejected the grounds based on *Strickland*, Wilson cannot meet the "contrary to" test in Section 2254(d)(1). Wilson instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined the facts.  In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable.  *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001).  The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

## A.  <u>Grounds of IAC Before Trial</u>

**<u>Ground Seven:</u>**

Wilson asserts that trial counsel was ineffective for coercing and intimidating Wilson into testifying at his first trial.  (Doc. 1 at 16–17)  At Wilson's retrial a court reporter testified on behalf of the prosecution and read Wilson's testimony from his first trial.  (Respondent's Exhibit 4 at 364–415)  The state appellate court reversed Wilson's conviction from his first trial because the self-defense instruction was erroneous.  *Wilson v. State*, 944 So. 2d 1244 (Fla. 2d DCA 2006).

The post-conviction court denied the claim as follows (Respondent's Exhibit 14 at 4–6) (state court record citations omitted):

> . . . Defendant alleges ineffective assistance of counsel for coercing and intimidating Defendant to testify at his first trial. Specifically, Defendant alleges that counsel told Defendant[,] "If you don't testify, you're going to lose, so if you tell me that you don't want to testify, then I might as well quit and you might as well plead guilty." Defendant asserts that the State used Defendant's testimony throughout the second trial to establish that Defendant gave an inconsistent version of how the stabbing occurred. Defendant alleges that counsel's errors prejudiced the outcome of the trial and rendered the proceedings fundamentally unfair.
>
> At the evidentiary hearing, Defendant's prior defense counsel from his first trial testified that Defendant's theory of defense was that of self-defense, and that, as there were no other witnesses to testify to such, the only way to present this would be through Defendant's testimony. Counsel testified further, however, that he in no way threatened or coerced Defendant to testify, nor told Defendant he would lose if he did not testify, as Defendant alleges. Specifically, counsel testified as follows:
>
> [Prosecutor]:     Did you ever tell the defendant if you don't testify you're going to lose, so if you tell me that you don't want to testify then I might as well quit and you might as well

|               | plead guilty? Did you ever say that to him? |
|---------------|---------------------------------------------|
| [Counsel]:    | I don't think I've ever told anybody that I might as well quit on anything. |
| [Prosecutor]: | Did the defendant ever tell you he did not want to testify? |
| [Counsel]:    | No, because if he tells — if he said that he — he didn't have to testify. I'm sure it was — I don't specifically remember a colloquy with the Court, but that's pretty much standard procedure. I would think that occurred. |
| [Prosecutor]: | Okay. At any time did you force the defendant to testify? |
| [Counsel]:    | No. |
| [Prosecutor]: | Did you threaten him that he had to testify? |
| [Counsel]:    | No. No more than I told him, as I just discussed earlier, that without his testimony there was no self-defense in the case, which is what he kept saying and claiming as his defense. |
| [Prosecutor]: | Did you ever feel like you were coercing the defendant to testify? |
| [Counsel]:    | No. |

The Court finds this testimony to be credible, and finds it supported by the record wherein the trial court conducted an inquiry of Defendant to ensure that his decision to testify was made freely and voluntarily, without coercion. Specifically, the record reflects the following colloquy:

|            |                                           |
|------------|-------------------------------------------|
| [Court]:   | Mr. Wilson, you understand that you have the absolute right to testify. You also understand that you have the absolute right to remain silent, is that correct? |
| [Wilson]:  | Yes. |

| [Court]: | Do you understand both of those rights that you have? |
| [Wilson]: | Yes. |
| [Court]: | And if you do testify this is a decision that you would have made in consultation with your lawyer? |
| [Wilson]: | Yes. |
| [Court]: | Okay. And so you are making the decision to testify freely and voluntarily, correct? |
| [Wilson]: | Yes. |
| [Court]: | Okay. And you — just to confirm, you understand that you do not have to testify in your own defense? |
| [Wilson]: | Yes. |

The court finds Defendant's allegations to be refuted, and that counsel cannot be deemed deficient as alleged under these circumstances. Consequently, Defendant warrants no relief on this allegation, and [this ground] of his Motion for Post-Conviction Relief must be denied.

The state court found trial counsel credible at the post-conviction evidentiary hearing, and a state court's finding of credibility receives deference in federal court. *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1292 (11th Cir. 2016) ("Federal habeas courts have no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.") (citation and internal quotation marks omitted).

The state court accurately quoted both trial counsel's testimony at the evidentiary hearing and the colloquy between Wilson and the trial judge at the first

trial.  (Respondent's Exhibit 13 at 51–52 and Exhibit 14, Transcript (May 25, 2005) at 402–03)  Trial counsel denied that he either threatened or coerced Wilson to testify at his first trial.  The colloquy confirms that Wilson freely and voluntarily testified.

Also, trial counsel testified that Wilson insisted that he acted in self-defense. (Respondent's Exhibit 13 at 49)  Wilson's infant son was not competent to testify about what happened, and Harris — the victim — was dead.  Fla. Stat. § 90.603. (Respondent's Exhibit 13 at 49)  Only Wilson could have testified that he acted in self-defense.  (Respondent's Exhibit 13 at 49–50)  Trial counsel fittingly advised Wilson that Wilson's testimony was necessary to prove his claim of self-defense. (Respondent's Exhibit 13 at 49–50, 54)

Because the record refuted the claim, the state court did not unreasonably deny the claim.  *Lott v. Att'y Gen., Fla.*, 594 F.3d 1296, 1302 (11th Cir. 2010); *Waters v. Thomas*, 46 F.3d 1506, 1519 (11th Cir. 1995); *Winfrey v. Maggio*, 664 F.2d 550, 552–53 (5th Cir. Unit A 1981).  Ground seven is denied.

## B.  Grounds of IAC During Trial

### Ground Four:

Wilson asserts that trial counsel was ineffective for not objecting to the jury instruction for the lesser included offense of manslaughter by act, which instruction erroneously states that the prosecution had to prove that Wilson intended to cause the death of Harris.  (Doc. 1 at 9–10)  Wilson contends that the evidence supported the lesser included offense, and the erroneous instruction deprived him of the lesser included offense at trial.  (Doc. 1 at 10)

The post-conviction court denied the claim as follows (Respondent's

Exhibit 12 at 4) (state court record citations omitted):

> . . . Defendant alleges fundamental error occurred when
> the  Court instructed the jury that the State had to prove
> that Defendant intentionally caused the victim's death in
> order to find Defendant guilty of the lesser included offense
> of manslaughter by act, or alternatively, ineffective assistance
> of counsel for failing to object to an erroneous jury instruction
> that told the jury that the State had to prove that Defendant
> intentionally caused the death of the victim in order to
> find Defendant guilty of the lesser included offense of
> manslaughter by act. Specifically, Defendant alleges counsel
> should have recognized that the language in the instruction
> for manslaughter would prevent the jury from returning a
> verdict for manslaughter unless they believed that Defendant
> intentionally killed the victim. Defendant asserts that the
> additional instruction of manslaughter by culpable negligence
> could have also reasonably misled or confused the jury.
> Defendant alleges that counsel's errors prejudiced the outcome
> of the trial and rendered the proceedings fundamentally unfair.
>
> After reviewing the allegations, the court file, and the record,
> the Court finds Defendant's allegations are without merit.
> Failure to object to a standard jury instruction that has not been
> invalidated by the Florida Supreme Court is not ineffective
> assistance. *See Elledge v. State,* 911 So. 2d 57, 77 (Fla. 2005);
> *Thompson v. State,* 759 So. 2d 650, 665 (Fla. 2000) (holding that
> it was not deficient for counsel to fail to object to a standard
> jury instruction that had not been invalidated by the Florida
> Supreme Court). The Court finds that the Court instructed the
> jury on the standard jury instruction for manslaughter, and thus
> counsel did not have a valid basis to object. Additionally,
> "fundamental error is not a basis for postconviction relief."
> *Moore v. State,* 48 So. 3d 911, 912 (Fla. 2d DCA 2010) (citing
> *Hughes v. State,* 22 So. 3d 132 (Fla. 2d DCA 2009)).
> Accordingly, the Court finds Defendant is not entitled to any
> relief on the allegations in [the claim].

The trial court instructed the jury on the lesser included offense of

manslaughter by act as follows (Respondent's Exhibit 4 at 576–77):

> To prove the lesser included crime of manslaughter the State
> must prove the following two elements beyond a reasonable
> doubt.

One. Michael A. Harris is dead.

Two. Dwayne Ricardo Wilson intentionally caused the death of Michael A. Harris . . . .

However, the defendant cannot be guilty of manslaughter if the killing was either justifiable or excusable homicide as I have previously explained those terms.

. . .

In order to convict of manslaughter by intentional act it is not necessary for the State to prove that the defendant had a premeditated intent to cause the death.

The jury instruction tracked the standard jury instruction for manslaughter by act at the time of trial. Fla. Std. Jury Instr. (Crim.) 7.7 (2007). Almost two years after the state appellate court affirmed Wilson's conviction (Respondent's Exhibit 9), *State v. Montgomery*, 39 So. 3d 252, 256–58 (Fla. 2010), held that the standard instruction was erroneous. Before *Montgomery*, Florida's Second District Court of Appeal approved the standard instruction. *Zeigler v. State*, 18 So. 3d 1239, 1244–45 (Fla. 2d DCA 2009). *Pardo v. State*, 596 So. 2d 665, 667 (Fla. 1992) ("'[I]f the district court of the district in which the trial court is located has decided the issue, the trial court is bound to follow it.'") (citation omitted).

Because trial counsel's performance is evaluated without the benefit of hindsight and the trial court used the standard instruction approved by the state appellate court at the time of trial, the state court did not unreasonably apply *Strickland*. *Strickland*, 466 U.S. at 669 ("[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

- 27 -

conduct from counsel's perspective at the time."); *Rambaran v. Sec'y, Dep't Corrs.*, 821 F.3d 1325, 1334 (11th Cir. 2016) ("[W]e have held many times that reasonably effective representation cannot and does not include a [r]equirement to make arguments based on predictions of how the law may develop.") (citation and quotation marks omitted).  Ground four is denied.

## Ground Six:

Wilson asserts that trial counsel was ineffective for not cross-examining Felicia Watson about the knife that she threw at Wilson.  (Doc. 1 at 15–16)  Felicia testified that she went inside to get the knife in the kitchen.  (Doc. 1 at 15)  Wilson instead contends that Harris attempted to stab Wilson with that knife, and Felicia took the knife from Harris.  (Doc. 1 at 15)  Wilson asserts that trial counsel should have shown on cross-examination that Felicia was lying.  (Doc. 1 at 15–16)

The post-conviction court denied the claim as follows (Respondent's Exhibit 14 at 2–4) (state court record citations omitted):

> . . . Defendant alleges ineffective assistance of counsel for failing to put the credibility of Ms. Felicia Watson in question at Defendant's second trial. Specifically, Defendant alleges [Felicia] testified that she walked out of the house and saw the victim lying on the ground[ ] dead. Defendant asserts [Felicia] asked him "what did you do to him," and that Defendant responded with profanity. Defendant alleges [Felicia] testified that she went back inside to get a knife, and then threw the knife at Defendant. Defendant asserts that [Felicia] actually picked up the knife the victim was using to try and stab Defendant. Defendant alleges counsel's failure to challenge [Felicia's] "absurd" testimony was prejudicial. Defendant alleges that counsel's errors prejudiced the outcome of the trial and rendered the proceedings fundamentally unfair.
>
> At the evidentiary hearing, Defendant testified that the victim came at him with a knife and Defendant reacted. Defendant

testified further that to his disbelief [ ] witness [Felicia] saw the
victim on the ground and then got a knife from inside the house
to throw at Defendant as he was leaving. Specifically,
Defendant testified as follows:

| | |
|---|---|
| [Post-conviction counsel]: | [D]id she throw a knife? |
| [Wilson]: | Yes. She claimed that she ran [into] the house and [threw] a knife at me, but that's kind of hard to believe that she could jump over a man [lying] there in that little tight space and pick up a knife and throw [it]. Now what she did most likely [was] pick that knife up that [the victim] had and try to get rid of it, try to cover up something. |
| [Post-conviction counsel]: | So you think she picked the knife up that the victim had — |
| [Wilson]: | Yes. |
| [Post-conviction counsel]: | — and threw that knife at you? |
| [Wilson]: | She [threw] it to probably get — she didn't throw it at me, she [threw] it to get rid of it because the knife she [threw] at me[,] the knife would have been — it would [have] land[ed] a lot further away [than] where it landed [ ]. |
| [Post-conviction counsel]: | But she threw a knife? |
| [Wilson]: | Yes. |
| [Post-conviction counsel]: | Okay. And then you left? |
| [Wilson]: | Yeah. |

At the evidentiary hearing, both of Defendant's prior defense
attorneys testified that nothing in the depositions or discovery
indicated that witness Felicia Watson had obtained the knife
from the victim, as Defendant alleges. Defendant's prior

defense attorney at Defendant's second trial testified further
that his notes indicate that [Felicia] had retrieved the knife
from inside the home. Counsel testified also that, at trial, after
impeaching [Felicia] to bring out her bias and to show she was
not an eyewitness to the incident, counsel asked Defendant if
there were any other issues he wanted brought out, but that
Defendant said nothing about the knife, as he now alleges. Also
at the hearing, the State brought out that, at his first trial, when
questioned about the incident, Defendant said nothing about
[Felicia] picking up a knife from the victim and throwing it,
as he now alleges. The Court finds counsel's testimony to be
credible, and finds it supported by the record wherein [Felicia's]
depositions demonstrate that she had obtained the knife from
inside the house. Specifically, in her deposition, [Felicia] stated
as follows:

[Felicia]: I ran in the house, I picked up the knife
and I threw it at [Wilson].

[. . .]

[Trial counsel]: What kind of a knife did you pick up out
of the house and throw?

[Felicia]: A kitchen knife that goes on the butcher
block.

[Trial counsel]: Where was that located?

[Felicia]: Where was it located at when? In the
house. In the kitchen on the countertop.

[Trial counsel]: And is that countertop close to this
doorway that we're talking about?

[Felicia]: Yes, it's probably about seven feet, I
guess. Maybe, if that. Probably about
seven feet.

[Trial counsel]: And, I mean, is this part of the small steak
knife set of a big kitchen knife? What was
it?

[Felicia]: Part of the butcher block, I don't
remember. It's like the next one to the
small one. I don't remember what size
it is. It's not large, I know that.

> The Court finds that, apart from Defendant's own speculations about the knife in his evidentiary hearing testimony, Defendant has offered no other supporting evidence to demonstrate that further questioning of [Felicia] at trial about where this knife came from would have resulted in testimony that she picked up the knife from the victim, as Defendant alleges, versus having gone back into the home and retrieving the knife from the kitchen, as her depositions and counsel's notes reflect. The Court finds that, under these circumstances, counsel cannot be deemed deficient as alleged, nor has Defendant demonstrated any prejudice as a result of counsel's alleged deficiency. As such, Defendant warrants no relief on this allegation, and [this ground] of Defendant's Motion for Post-Conviction Relief must be denied.

The state court found trial counsel credible at the post-conviction evidentiary hearing, and a state court's finding of credibility receives deference in federal court. *Nejad*, 830 F.3d at 1292. The state court accurately quoted testimony by Wilson at the evidentiary hearing and testimony by Felicia at her deposition. (Respondent's Exhibit 13 at 11–12 and Exhibit 14, Transcript (Dec. 29, 2004) at 20, 25–26) Also, the state court accurately summarized testimony by both trial attorneys at the evidentiary hearing and testimony by Wilson at his first trial. (Respondent's Exhibit 13 at 23–24, 28, 33–35, 37, 41, 47–48, 59–62)

At her deposition Felicia testified that she took the knife from the kitchen. Because Felicia neither told police nor testified at her deposition that she took the knife from the victim, trial counsel could not have impeached her with an inconsistent statement. Fla. Stat. § 90.608(1). At the evidentiary hearing Wilson denied that he saw Felicia throw the knife at him. (Respondent's Exhibit 13 at 11) Wilson neither told trial counsel nor testified at his first trial that Felicia picked up the knife from the victim. Because no evidence in discovery tended to show that

Felicia picked up the knife from the victim, trial counsel lacked good faith to confront Felicia with that theory of the case. *King v. State*, 89 So. 3d 209, 224 (Fla. 2012) ("[Q]uestions asked during cross-examination must have a good-faith basis."). Finally, the claim was speculative because at the evidentiary hearing Wilson presented no evidence that trial counsel could have used to impeach Felicia. *Hunt v. Comm'r, Ala. Dep't Corrs.*, 666 F.3d 708, 723 (11th Cir. 2012) ("'Absent a showing that real impeachment evidence was available and could have been, but was not, pursued at trial, [the petitioner] cannot establish that the cross conducted by his attorneys fell outside the range of professionally competent assistance.'") (citation omitted).

Wilson asserts that trial counsel should have asked Felicia why she ignored Harris who was dying and instead went inside to get a knife to throw at Wilson. (Doc. 1 at 16)  Wilson contends that Felicia's testimony about the kitchen knife was "absurd." (Doc. 1 at 16)  However, Felicia testified that she saw both Harris lying on the ground and Wilson walking to his car. (Respondent's Exhibit 4 at 199, 202)  Felicia did not see any blood around Harris. (Respondent's Exhibit 4 at 204)  Felicia asked Wilson, "What did you do to him?" (Respondent's Exhibit 4 at 203)  Wilson called Felicia a "b*tch," and Felicia became upset, ran inside, got the knife, went back outside, and threw the knife at Wilson. (Respondent's Exhibit 4 at 203, 205)  After Wilson left, Felicia went to Harris and asked him what was wrong. (Respondent's Exhibit 4 at 205)  Felicia noticed that Harris's eyes were "rolling," and blood gushed out of his neck. (Respondent's Exhibit 4 at 205–06)

Felicia ran inside and got the knife from the kitchen unaware of the extent of Harris's injuries.  Even if trial counsel had asked Felicia why she ignored Harris and instead went inside to get a knife to throw at Wilson, the outcome at trial would not have changed.  *Strickland*, 466 U.S. at 694.  Consequently, the state court did not unreasonably apply *Strickland*.  Ground six is denied.

## VI.  <u>CONCLUSION</u>

Wilson's application for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Wilson and **CLOSE** this case.

**CERTIFICATE OF APPEALABILITY**
**<u>AND LEAVE TO APPEAL *IN FORMA PAUPERIS*</u>**

Because Wilson fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate either the merits of the grounds or the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Wilson must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on March 31, 2021.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE